**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LINEWEIGHT LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CRYE PRECISION LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-cv-00387-JAR |
| | ) | |
| FIRSTSPEAR, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on the parties' competing motions for claim construction, memoranda, declarations, and responses.  (Docs. 49-54, 57-59.)  A hearing was held on April 16, 2019, at which both parties presented oral argument in support of their proposed constructions.

On June 14, 2019, while this motion was pending, Defendant moved to stay the case so it could petition the Patent Trial and Appeal Board ("PTAB") for Inter Partes Review ("IPR").  (Doc. 69.)  The Court granted the motion and stayed the case.  (Doc. 77.)  On December 16, 2019, the parties notified the Court that the PTAB had denied Defendant's petition.  (Doc. 78.)  Plaintiffs moved the Court to lift the stay but Defendant sought to keep it in place so it could request a rehearing.  (*Id.*)  The Court continued the stay and directed the parties to update it when the PTAB decided the request for rehearing.  (Docs. 80, 81.)

On March 25, 2020, the PTAB denied Defendant's request for rehearing, and the parties sought to reopen the case.  (*See* Doc. 82.)  The Court will grant that motion, lift the stay, and

1

consider the pending motions for claim construction in earnest.  To that end, the Court granted Defendant's Motion for Leave to Submit Supplemental Evidence on April 1, 2020. (Doc. 84). The Court will therefore consider the supplemental evidence and the arguments raised in the parties' related briefing.  (Docs. 83, 85, 86, 89.)

### Background

On November 3, 2015, the U.S. Patent and Trademark Office ("USPTO") issued patent number 9,173,436 (the " '436 Patent") for a "MOLLE COMPATIBLE LIGHTWEIGHT GARMENT" (the "Garment").  (Doc. 1-1 at 2.)  Under the invention summary, the inventor wrote that the Garment:

> offers a lightweight attachment structure which minimizes the material used by reducing the garment to a skeleton of horizontal bands connected by a few vertical bands.  The garment . . . is composed of a glued layup of a substrate which is adhered to an outside layer . . . cut to define an array of holes . . . compatible with many [Pouch Attachment Ladder System ("PALS") and Modular Lightweight Load-carrying Equipment ("MOLLE")] accessories, and is very lightweight.

(*Id*. at 1:55-64.)  The '436 Patent also lists the object of the garment:  "to provide a load supporting garment which is compatible with the MOLLE system which is very lightweight . . . [and] which can be produced to accommodate attachments at any desired location." (*Id*. at 2:1-3.)  The '436 Patent also references an accessory which can be attached to the Garment by way of a strap attached to the rear wall of the accessory and engaging the Garment's horizontal straps (the "Accessory").  (*Id*. at 6:6-13.)  The Patent listed non-party Caleb Clark Crye as inventor and named Plaintiff Lineweight as assignee.  (Doc. 1-1 at 2.) Lineweight in turn granted to Plaintiff Crye Precision an exclusive license in the '436 Patent, including rights to sublicense and to sue for infringement.  (Doc. 1 at 2;

Defendant FirstSpear is a tactical equipment company that designs, manufactures, and sells gear to military, law enforcement, and private users.  *See* ABOUT FIRSTSPEAR

https://www.first-spear.com/about-first-spear (last visited Mar. 31, 2020).  Among its products are the "Assaulter Armor Carrier (AAC) System" platform, "JOKER – Jungle Operations Airborne Capable Chest Rig," and a "Modular Chest Rig 6/12," all of which Plaintiffs argue infringe on the '436 Patent.  (Doc. 1 at 4.)

### 1.  The Prosecution History

On January 14, 2011, Crye submitted his application for what would become the '436 Patent.  (Doc. 53-1.)  The application included twenty-one claims.[1]  (*Id*. at 17-20.)  Prosecution Claim 1 read:

> A load supporting garment comprising:
>
> elements arranged to engage a wearer and to support the garment thereon; and
>
> a bearing frame assembly connected to said elements, the bearing frame assembly having a substrate and an exterior layer fixed to the substrate, the bearing frame having portions defining a plurality of openings which extend through the substrate, and portions between two vertically spaced openings which define a first horizontal band, the substrate being a material different from the material of the exterior layer.

(*Id*. at 17.)  Prosecution Claim 6 read:

> A load supporting garment which is compatible with MOLLE accessories, comprising:
>
> elements arranged to engage a wearer and to support the garment thereon; and
>
> a bearing frame assembly connected to said elements, the bearing frame assembly having a substrate having portions defining a plurality of openings which extend through the substrate to define a plurality of vertically spaced horizontal bands, with one band spaced above another with an opening positioned therebetween, the spacing between an upper perimeter of one horizontal band and a upper perimeter of a horizontal band immediately below it being at least about two inches, such that MOLLE accessories may be received and attached to the horizontal bands.

(*Id*. at 18.)

---

[1] The Court uses "Prosecution Claim" to identify a claim as initially submitted, either in the application or at a later point during the prosecution of the '436 Patent.  The Court uses "Amended Claim" to identify a Prosecution Claim that has been changed and resubmitted during the prosecution of the '436 Patent.  The Court uses "Issued Claim" or simply "Claim" to identify a Prosecution Claim or Amended Claim as included in the final '436 Patent.

On February 7, 2013, Crye and his attorney met with Examiner Andrew Sutton in an applicant-initiated interview.  (Doc. 37-4.)  They discussed Prosecution Claim 6 in relation to prior art[2] for "Load-Bearing Equipment" invented by Albert Hellweg, U.S. Patent No. 7,644,449 (issued Jan. 12, 2010) ("Hellweg").  (*Id.*)  According to the examiner's summary of that interview, Crye "stated that he would amend the claims to further define the size of the opening as being at least one inch," which the examiner described as being "required for attachment to the Molle/PALS system." (*Id.* at 3.)

Crye submitted several amended claims on March 5, 2013, including Amended Claim 1, which he had modified to describe the fixture of the two layers by heat-activated adhesive and to note that the openings in the Garment would be laser cut or die cut to distinguish it from Hellweg's reinforced woven openings.  (Doc. 37-5 at 9.)  In addition, he added a reference to "a second horizontal band" that would be spaced from the first horizontal band "such that MOLLE accessories may be received and attached to the horizontal bands." (*Id.* at 3.)  He also submitted Amended Claim 6, which had been altered to define the openings between the horizontal band as "extending at least one inch." (*Id.* at 4, 8.)

On June 14, 2013, the USPTO issued an office action[3] summary rejecting all twenty-one of Crye's submitted claims.  (Doc. 37-7 at 3.)  Amended Claim 1 was rejected based on Hellweg and one other earlier invention, the examiner having found that the prior art covered everything in Amended Claim 1 except the use of a substrate of material different from the exterior layer and "the specific spacing for receiving MOLLE accessories." (*Id.* at 5.)  Amended Claim 6 was

---

[2] "Prior art" refers to earlier inventions that were "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed [new] invention."  35 U.S.C. § 102(a)(1).

[3] An "office action" is "a letter from a trademark examining attorney setting forth the legal status of a trademark application."   U.S. PATENT AND TRADEMARK OFFICE, GLOSSARY, https://www.uspto.gov/learning-and-resources/glossary [hereinafter *USPTO Glossary*].

4

rejected based on the same prior art, the examiner noting that only the one-inch opening and two-inch spacing was outside the scope of Hellweg.  (*Id*. at 6.)

Crye submitted more amendments on August 27, 2013.  (Doc. 37-8.)  Amended Claim 1 was further altered to clarify the process of laser cut or die cut openings.  (*Id*. at 3.)  Amended Claim 6, however, was resubmitted unchanged.  (*Id*. at 4.)

On July 22, 2014, the USPTO issued a new office action summary rejecting all twenty-one submitted claims.  (Doc. 37-10.)  Once again, the examiner noted that Hellweg covered the majority of Amended Claims 1 and 6.  (*Id*.)  Following this second office action, Crye and his attorney met with Examiner Sutton and his supervisor.  (Doc. 31-11.)  At that October 7, 2014, applicant-initiated interview, the group discussed Amended Claims 1 and 6 in relation to Hellweg and other prior art.  (*Id*. at 3.)  The examiner's summary records Crye's assertion that "the size of the openings [described in Amended Claim 1] would not work with [Hellweg]."  (*Id*.)  In addition, Crye noted that the materials in Hellweg were different from the materials contemplated for the Garment.  (*Id*.)  The examiner suggested that Crye add limitations to the claim regarding the "benefits of the materials or size openings," and explained that "it would be beneficial to positively claim the relationship of the [G]arment and the [A]ccessory."  (*Id*.)

Crye again submitted amendments on January 21, 2015.  (Doc. 37-13.)  He submitted an updated Amended Claim 1 that added "a printed" exterior layer "adhered" to the substrate, and removed references to heat-activated film and die-cut holes.  (*Id*. at 3.)  To Amended Claim 6, he added a number of specific measurements, including 1.5 inches between centerlines of neighboring 1/8-to-1/2-inch-wide vertical bands, as  well as vertical openings of at least one inch.  (*Id*. at 4.)  In addition, Crye added three new claims, including Prosecution Claim 23, which read:

The load supporting garment of claim 1 further comprising an accessory, wherein the accessory comprises:

a rear wall;

a strap fastened to the rear wall; and

the strap extending around one of the first and the second horizontal bands of the garment to thereby mount the accessory to the garment.

(*Id*. at 6.)

On May 27, 2015, the USPTO issued its third office action summary.  (Doc. 37-14.)  For the first time, the examiner allowed a number of Crye's claims, including Amended Claim 6. (*Id*. at 3.)  However, Amended Claim 1 was again rejected on the basis of Hellweg and other prior art, and, while Prosecution Claim 23 was not allowed, it was rejected solely because it depended from the rejected Claim 1.  (*Id*. at 4-5, 7.)  The examiner stated that Prosecution Claim 23 "would be allowable if rewritten in independent form including all of the limitations of [Amended Claim 1]."  (*Id*. at 7.)

Following the examiner's suggestions, Crye submitted further amendments on August 27, 2015.  (Doc. 37-16.)  He withdrew Amended Claim 1 but incorporated the entirety of its text into an Amended Claim 23.  (*Id*.)  He also removed references to a "printed" exterior from Amended Claim 6.  (*Id*.)

### 2. The Specification

On November 3, 2015, nearly four years after Crye's initial submission, the '436 Patent was issued.  (Doc. 1-1.)  Amended Claim 6 was issued as Claim 1 in the final specification. (*Compare id.* at 5:6-32 *with* Doc. 37-16 at 4.)  Amended Claim 23—which incorporated all of Amended Claim 1—was issued as Claim 11.  (*Compare* Doc. 1-1 at 6:14:36 *with* Doc. 37-16 at 6.)  As issued, Claim 11 reads as follows:

A load supporting garment and accessory arrangement, comprising:

6

elements arranged to engage a wearer and to support the garment thereon; and

a bearing frame assembly connected to said elements, the bearing frame assembly having a substrate and a printed exterior layer adhered to the substrate, the bearing frame having portions defining a plurality of laser cut openings which extend through the substrate and the exterior layer, and portions between two vertically spaced openings which define a first horizontal band above a second horizontal band, the substrate being a material different from the material of the exterior later, the first horizontal band being spaced from the second horizontal band such that MOLLE accessories may be received and attached to the horizontal bands; and

further comprising an accessory, wherein the accessory comprises:

a rear wall;

a strap fastened to the rear wall; and

the strap extending around one of the first and the second horizontal bands of the garment to thereby mount the accessory to the garment.

(Doc. 1-1 at 6:13-37.)  The parties dispute the meaning of six claim phrases from within Claim 11, asking the Court to determine how each should be understood.

## Legal Standards

Before a jury can determine whether a defendant has infringed on a plaintiff's patent, the Court must determine the meaning and scope of the patent by construing its language.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  Construction is "a question of law, to be determined by the court."  *Id.*

Courts first look at "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims,[4] the specification[5] and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  Courts begin with "the words of the claims themselves, both asserted and nonasserted," giving the words in a claim "their ordinary

---

[4] A patent includes numerous "claims" that "define the invention and [denote] what aspects are legally enforceable."  *USPTO Glossary*, *supra* note 3.

[5] The "specification" is the "written description of the invention and the manner and process of making and using the same."  *USPTO Glossary*, *supra* note 3.

and customary meaning," *id.*, "which is 'the meaning that the term would have to a person of ordinary skill in the art[6] in question at the time of the invention,'" *Leggett & Platt, Inc. v. Vutek, Inc.*, No. 4:05CV788 CDP, 2006 WL 1479537, at *1 (E.D. Mo. May 25, 2006) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)).

That said, a patentee may opt to "use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. Accordingly, "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* The specification "is the single best guide to the meaning of a disputed term." *Id.*

The last piece of intrinsic evidence courts consider is the prosecution history of the patent. *Id.* The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims" and therefore "is often of critical significance in determining the meaning of the claims." *Id.*

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term" and courts need not—indeed, cannot—rely on extrinsic evidence. *Id.* at 1583. If, however, the ambiguity remains, courts may consider extrinsic evidence such as expert testimony. When considering extrinsic evidence, courts may only "consult trustworthy extrinsic evidence to ensure that the claim construction . . . is not inconsistent with clearly

---

[6] Defendant "identifies the level of skill in the art as someone possessing five years of experience in material or textile science, or alternatively at least five years of experience in military or first-responder gear design or analysis." (Doc. 50 at 5.) Plaintiffs do not state their position on the relevant level of skill. (*See* Doc. 52.)

8

expressed, plainly apposite and widely held understandings in the pertinent technical field." *Leggett*, 2006 WL 1479537, at \*2 (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999)).

## Analysis

The parties submit six disputed claim phrases from Claim 11 which they ask the Court to construe:

1.  "elements arranged to engage a wearer;"

2.  "a plurality of laser cut openings;"

3.  "a first horizontal band above a second horizontal band;"

4.  "the first horizontal band being spaced from the second horizontal band;"

5.  "the substrate being a material different from the material of the exterior layer;" and

6.  "the strap extending around one of the first and the second horizontal bands."

(Doc. 37-1.)  Plaintiffs argue that five of the six disputed phrases are easily understandable from their plain and ordinary meanings and that only the fourth disputed claim phrase needs to be construed.  (Doc. 52.)  Defendants argue that all six phrases must be construed.  (Doc. 50.)

### Phrase 1. "elements arranged to engage a wearer"

Defendant argues that this claim phrase should be construed as:  "front and rear segments joined by shoulder straps and side portions that allow the garment to be worn by an individual." (Doc. 50 at 6.)  It argues that the text of the specification limits the Garment to a wearable item with "a front, back, shoulder straps and side portions."  (*Id*. at 7.)

In support of its proposed construction, Defendant first points to the "Description of the Preferred Embodiments," [7] which reads:  "The garment is a vest with a front segment joined to a

---

[7] An "embodiment" is an example included in the specification to illustrate one way "in which an invention can be made, used, practiced or expressed."  *USPTO Glossary*, *supra* note 3.

rear segment by two shoulder straps.  The vest also has side portions.  These elements are arranged to engage a wearer and to support the garment thereon."  (Doc. 1-1 at 2:27-30.) Defendant also cites an office action summary in which Examiner Sutton notes that the "the vest structure" of the '436 Patent is too similar to Hellweg.  (Doc. 37-10 at 4-5.)

Defendant cites *GLG Farms LLC v. Brandt Agric. Prod., Ltd.*, 741 F. App'x 794, 797–98 (Fed. Cir. 2018), for the proposition that, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention" to that embodiment.  (quoting *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013)).  However, the *GLG Farms* court also noted, "[W]e have 'expressly rejected the contention that, if a patent describes only a single embodiment, the claims of the patent *must* be construed as being limited to that embodiment.'"  *GLG Farms*, 741 F. App'x at 797 (quoting  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (emphasis added)).  Indeed, "[i]t is not proper to limit what is claimed to preferred embodiments or specific examples in the specification if the patentee did not demonstrate a clear intent to deviate from the claim terms' ordinary meaning in that way, or to otherwise disavow the claim scope."  *Sigma-Aldrich, Inc. v. Open Biosystems, Inc.*, 521 F. Supp. 2d 975, 981 (E.D. Mo. 2007) (citing *Teleflex Inc. v. Ficosa N. Am., Corp.*, 299 F.3d 1313, 1326-28 (Fed. Cir. 2002)).

Defendant points to the '436 Patent's "Brief Description of the Drawings," which states that "FIG. 2 is a schematic fragmentary front view of a portion of the garment *of this invention*" and "FIG. 3 is a perspective view of the equipment carrying garment *of this invention*."  (Doc. 1-1 at 2:10-18 (emphasis added); Doc. 50 at 8.)  The Court does not believe *GLG Farms* supports Defendant's preferred construction in the way Defendant implies.  Of note, the description of the embodiment at issue in *GLG Farms* included specific language describing the spatial relationship of the invention's constituent parts.  *Id*.  In so doing, the embodiment disavowed any application

10

in which the parts are not similarly aligned.  *Id*. ("The '131 patent therefore disclaims an embodiment in which the drive assemblies are *not* mounted between the end walls.")  While the "Brief Description of the Drawings" in the '436 Patent refers to the "invention as a whole," it does not describe the Garment in a manner that disclaims alternate arrangements of its constituent parts.  (*See* Doc. 1-1 at 2:10-18.)  In other words, it does not suggest, as the patent at issue in *GLG Farms* did, that the illustrated arrangement of parts is necessary for the operation of the invention and therefore does not disclaim all other arrangements.

The Court is also not persuaded that the examiner's reference to Hellweg in his interview summary compels it to use Defendant's construction.  It does not believe an examiner's passing reference to a given embodiment is sufficient to overcome the general rule against limiting the patent's scope to the preferred embodiment or the direct evidence contradicting Defendant's proposed construction.

Meanwhile, Plaintiffs maintain that "elements arranged to engage a wearer" is "readily understandable by a jury without any further construction."  (Doc. 52 at 6.)  They point to language in the specification that the invention could be used "on a belt *or* a vest" (Doc. 1-1 at 1:34-35 (emphasis added)), and a disclaimer that "the invention is not limited to the particular construction and arrangement of parts herein illustrated and described" (*id*. at 5:1-4).

The Court rejects Plaintiffs' first claim that the '436 Patent expressly contemplates using the invention "on a belt or a vest."  (*See* Doc. 52 at 78 (quoting Doc. 1-1 at 1:34-35).)  It is readily apparent to the Court that the quoted language refers not to the Garment, but to uses of the PALS system:  "A standard attachment system employed by US military services is the U.S. Army's PALS . . . . This system can be provided on a belt or a vest."  (Doc. 1-1 at 1:34-35.)  The Court will not infer from that reference a similar range of uses for the invention covered by the

'436 Patent, particularly in light of the next paragraph of the specification, which distinguishes the new invention from "[c]onventional" systems like PALS and MOLLE.  (*Id*.)

Likewise, the Court is not persuaded by the boilerplate language of the specification reading:  "It is understood that the invention is not limited to the particular construction and arrangement of parts herein illustrated and described, but embraces all such modified forms thereof as come with the scope of the [specification's] claims."  (Doc. 1-1 at 5:1-4.)  Similar disclaimers appear in nearly every patent and are of little help in identifying the scope of a particular invention.

Still, the Court concludes that Defendant's preferred construction reads a limitation into the first disputed claim phrase that is not supported by the plain language of the claim or the intrinsic evidence.  Accordingly, the Court agrees with Plaintiffs that construction of this claim phrase is unnecessary and that its plain and ordinary meaning can be understood as written.

> **Phrase 2. "*a plurality of laser cut openings;*"**
> **Phrase 3. "*a first horizontal band above a second horizontal band;*" and**
> **Phrase 4. "*the first horizontal band being spaced from the second horizontal band*"**

The second, third, and fourth disputed claim phrases all deal with the size of the openings cut into the Garment.  At the hearing, the parties agreed that the phrases were interrelated, and the Court will therefore construe them together.

The parties' proposed constructions both flow from the '436 Patent's twin objectives:  to significantly reduce weight and to remain MOLLE-compatible.  The invention itself is titled, "MOLLE COMPATIBLE LIGHTWEIGHT GARMENT."  (*See* Doc. 1-1 at 1.)  Its abstract reads:  "A *MOLLE system compatible* garment has a *lightweight* attachment structure with a *skeleton* of horizontal bands connected by a [sic] vertical bands."  (*Id*. (emphasis added).)  The invention summary describes "a *lightweight* attachment structure which minimizes the material

used by reducing the garment to a *skeleton* of horizontal bands connected by a few vertical bands." (*Id*. at 1:55-57 (emphasis added).)  In fact, the specification asserts that the Garment weighs less than prior art, despite being made from denser materials, because, "by cutting holes out of the material, the bearing frame assembly has less material per square yard of system coverage, and hence overall lower density which can result in a weight savings of 45 percent." (Doc. 1-1 at 4:10-13.)  Indeed, the specification contemplates removing "as little as 25% or as large as 75%" of the material in the bearing frame assembly.  (*Id*. at 4:24-25.)

The prosecution history confirms the centrality of both goals.  In the remarks accompanying the amended claims submitted on March 5, 2013, Crye noted that he had told the examiner that "reducing the weight of [a] soldier's gear is important" but that "ballistic armor is not getting lighter," so the only way to reduce the load on wearers is "[b]y reducing the weight of the armor carrier."  (Doc. 37-5 at 8.)  In addition, Crye distinguished his invention from Hellweg on the basis of MOLLE compatibility, asserting that "Hellweg shows a completely different system not interoperable with the MOLLE PALS system."  (Doc. 37-8 at 9.)  Accordingly, both parties agree that the '436 Patent is designed to be lightweight and MOLLE-compatible.

The parties disagree, however, on whether these goals require the removal of a specific amount of material.  Defendant argues that the Garment's "multiple laser cut openings" must be of some significant height to meaningfully reduce weight, and that Crye defined "MOLLE compatibility" for purposes of the '436 Patent as requiring one-inch-tall openings separated by one-inch straps.  (Doc. 50 at 9-10); *see World Wide Stationery Mfg. Co. v. U.S. Ring Binder, L.P.*, No. 4:07-CV-1947(CEJ), 2009 WL 2982904, at *7 (E.D. Mo. Sept. 14, 2009) (quoting *Johnson WorldWide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999) ("[w]hen a patentee chooses to be his or her own lexicographer, that definition must be applied to the claim")).  Specifically, Defendant notes that Crye told the examiner "he would amend

[Prosecution Claim 6] to further define the size of the opening as being *at least one inch . . . [as] required for attachment to the Molle/PALS system*."  (Doc. 37-4 at 3 (emphasis added).) Immediately after that interview, Prosecution Claim 6 was amended to define the openings between horizontal bands as "extending at least one inch" and Prosecution Claim 1 was amended to expressly state that "MOLLE accessories may be received and attached."  (Doc. 37-5 at 3, 4.)

   Crye later stated that "Hellweg shows a completely different system not interoperable with the MOLLE PALS system."  (Doc. 37-8 at 9.)  Defendant asserts that the examiner also routinely distinguished the Garment from Hellweg based on the one-inch height of the openings; because Hellweg uses narrow slots, U.S. Patent No. 7,644,449, Defendant argues that the '436 Patent would not have issued absent the tall openings required by Crye's specialized definition of "MOLLE-compatibility."

   Meanwhile, the preferred embodiment is described as having "horizontal bands [that] match the conventional MOLLE PALS spacing of 1[inch] wide horizontal bands separated by a 1[inch] gap" with "spacing between an upper perimeter of one horizontal band and a upper perimeter of a horizontal band immediately below it being at least about two inches, such that MOLLE accessories may be received and attached to the horizontal bands."  (Doc. 1-1 at 3:29-41.)  Indeed, the specification goes on to say that "[a]s long as this spacing between the top perimeters of the horizontal bands is maintained, there will be compatibility with MOLLE accessories."

   Accordingly, Defendant argues that the second disputed claim phrase should be construed as:  "multiple laser cut openings each around one inch tall;" the third disputed claim phrase should be construed as "a first horizontal band immediately above a second horizontal band;" and the fourth disputed claim phrase should be construed as "the spacing between the upper

perimeter of the first horizontal band and the upper perimeter of the second horizontal band is at least two inches."  (Doc. 50 at 9-17.)

Plaintiffs respond first that there is no need to construe the second claim phrase because "the phrase 'a plurality of laser cut openings' is readily understandable by a jury without any further construction."  (Doc. 52 at 9.)  In addition, Plaintiffs assert that Defendant's proposed construction of these disputed claim phrases relies on a misreading of the specification and takes portions of the prosecution history out of context.  (Doc. 52 at 9-16.)

Plaintiffs argue that "it is not proper to limit what is claimed to preferred embodiments or specific examples in the specification if the patentee did not demonstrate a clear intent to deviate from the claim terms' ordinary meaning in that way, or to otherwise disavow the claim scope." *Sigma-Aldrich, Inc. v. Open Biosystems, Inc.*, 521 F. Supp. 2d 975, 981 (E.D. Mo. 2007) (citing *Teleflex Inc. v. Ficosa N. Am., Corp.*, 299 F.3d 1313, 1326-28 (Fed. Cir. 2002)).  As discussed above, Plaintiffs argue that the use of "this invention" when describing the preferred embodiment is insufficient to demonstrate the requisite intent to so limit the invention.

In addition, Plaintiffs argue that the description of the preferred embodiment expressly defines "holes **66**" as including both "full height openings **78**" and "narrow slots **80**" and that Defendant's proposed construction would impermissibly read "narrow slots **80**" out of the preferred embodiment.  *See  Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1367 (Fed. Cir. 2018).  Both the description and Figures 3 and 4 plainly include them.  (Doc. 1-1 at Fig. 3, Fig. 4, 2:50-61.)

Further, Plaintiffs point to language in the specification that undermines Defendant's argument that Crye mandated a uniform grid of bands with specific heights and spacing.  They note that the openings in the Garment "may be cut to the desired configuration to add the through holes of the desired shape and location," that "the openings need not be strictly rectangular," and

15

that the horizontal bands "may be positioned in any arrangement desired." (Doc. 1-1 at 3:17-45.)
Likewise, the specification contemplates a wide range of removed material—"as little as 25% or
as large as 75%"—suggesting that the relative spacing between horizontal bands may vary in
size. (*Id*. at 4:24-25.) This directly contradicts Defendants' argument that the openings must be
standardized or on a one-inch-by-two-inch grid.

Plaintiffs also argue that the doctrine of claim differentiation undermines Defendant's
proposed construction. Claim differentiation holds that when an invention shows that he or she
knows how to include a limitation in one claim, there is a rebuttable presumption that the
absence of that limitation in another claim was intentional. *See Kraft Foods, Inc. v. Int'l Trading
Co.*, 203 F.3d 1362, 1367 (Fed. Cir. 2000). Claim 1 expressly defines vertical and horizontal
dimensions for openings in the Garment. (Doc. 1-1 at 5:6-32.) Claim 11 does not. (*Id*. at 6:13-
36.) Plaintiffs argue that this shows that Crye "plainly knew how" to limit the openings when he
so desired and that his decision not to do so in Claim 11 is conclusive evidence that Claim 11
was not so limited. *Kraft*, 203 F.3d at 1367; (Doc. 52 at 14). Moreover, Plaintiffs argue that it is
clear from the prosecution history of Claim 11 that Crye took great pains to avoid limiting the
dimensions of that claim by consistently resubmitting amendments that did not include
measurements for openings or spacing.

The Court finds that the intrinsic evidence of record does not support Defendant's
proposed construction of the second disputed claim phrase. At the outset, the Court agrees with
Plaintiffs that the ordinary and customary meaning of "a plurality of laser cut openings" is
readily understandable and does not need construed. *Vitronics Corp.*, 90 F.3d at 1582. In
addition, both the specification and prosecution history support the Court's conclusion that the
phrase should not be construed as Defendant suggests. The stated objects of the invention—to
reduce weight while remaining MOLLE-compatible—may be achieved by any number of

vertical heights for the openings; the elimination of *any* material by cutting openings in the Garment will have the effect of reducing the Garment's weight, and the Garment can be lightweight without a uniform one-inch height for openings.  Likewise, the Garment may be MOLLE-compatible without uniform one-inch-tall openings; Defendant's own products manage to do this.

Defendant submits as supplemental evidence the PTAB's decision denying Crye's IPR institution in *Crye Precision LLC v. FirstSpear, LLC*, Case No. IPR2019-01153, Paper No. 8 (P.T.A.B. November 22, 2019), a case involving U.S. Patent No. 9,565,922 ("the '922 Patent") for a "light weight modular pouch attachment system and method."  (Doc. 83.)  Defendant cites the PTAB's distinction between "slots **80**" in the '436 Patent and "narrow slits" in the '922 Patent as evidence that the "openings" at issue in this disputed claim are necessarily taller than simple slits in the fabric.  (*Id.* at 2.)  In other words, the openings described in the '436 Patent must have a specific height.

The Court finds the supplemental evidence unhelpful in answering the specific question before it, namely whether the openings in the '436 Patent must be one inch tall.  While the Court is receptive to the PTAB's reasoning that a "slot" must be taller than a "slit," such reasoning does not indicate any specific height.  Again, the objects of the '436 Patent—eliminating weight while remaining MOLLE-compatible—are possible with openings of various heights; that "openings" must be larger than "slits" does not necessarily mean that "openings" must be "around one inch tall."

As noted, Defendants argue that the height requirement can be found in the form of Crye's statements during prosecution, but the Court is not persuaded by Defendant's argument that Crye was acting as his own lexicographer in defining "MOLLE compatibility" to require one-inch-tall openings, especially given that the requirement is not true in practice.  To hold an

inventor to his own definition of a term, the inventor must have "clearly set[] forth an explicit definition for a claim term." *Johnson WorldWide Assocs.*, 175 F.3d at 990.  Having reviewed the prosecution history, the Court does not believe Crye did so here.

First, the Court does not believe that the '436 Patent should be limited to the preferred embodiment.  Of particular note are the narrow slots **80**, which are very clearly contemplated in the preferred embodiment.  If the Court limits the claim phrase to the preferred embodiment and construes it as Defendant suggests, those narrow slots would not be "openings."  That outcome is inconsistent with the text of the specification; the Court rejects any argument that Crye set forth an explicit definition for a claim term that would place the preferred embodiment outside the scope of the patent.

Relatedly, the Court finds Plaintiffs' claim-differentiation argument persuasive in light of the Claims' text and their individual prosecution history.  Of particular note is that Claim 11— which was submitted as Prosecution Claim 1 and eventually incorporated wholesale into Amended Claim 23—never included specific dimensions for the openings.  This was so even while Crye amended Prosecution Claim 6 numerous times to add or amend required dimensions. The Court finds no evidence in the prosecution history to suggest that this presumed differentiation should be ignored.

The Court will also give disputed claim phrases three and four their plain and ordinary meaning.  While these claim phrases do not expressly include references to the size of the openings, Defendant's construction of all three claim phrases relied on a finding that Crye defined MOLLE compatibility to require one-inch openings.  There is insufficient evidence to lead the Court to that conclusion.  Accordingly, the Court will leave disputed claim phrases two, three, and four as they are because their plain and ordinary meaning can be understood as written.

18

**Phrase 5. "*the substrate being a material different from the material of the exterior layer*"**

Plaintiffs assert that the Court should construe the fifth disputed claim phrase as:  "the substrate being a *material having different properties* from the material of the exterior layer."  (Doc. 52 at 20 (emphasis added).)  Defendant, meanwhile, proposes: "the substrate being made from *a different base polymer or resin* than the exterior layer."   (Doc. 50 at 21 (emphasis added).)

Plaintiffs' proposed construction relies heavily on the distinct functions of the two layers: "The substrate is the 'load bearing component' of the bearing frame assembly, while the exterior layer is an 'outer cover' that camouflages or otherwise decorates the garment."  (Doc. 52 at 17 (citing Doc. 1-1 at 3:64-67, 2:64-3:10).)  Elsewhere in the specification, there is discussion of the "excellent impact resistance and stiffness and lightweight composition" of a substrate made from TEGRIS polypropylene thermoplastic and the "lightweight, printable, and abrasion resistant" external layer made from CORDURA nylon fabric.  (Doc. 1-1 at 2:62-3:10, 4:44-47.)  Plaintiffs assert that this discussion highlights the important function of each layer and demonstrates why the fifth disputed claim phrase should be construed with those functions in mind—that is, the Court should construe the claim phrase based on the characteristics of the final materials rather than their original chemistry.  (Doc. 52 at 17-18.)

Plaintiffs also reference Claims 12 and 15, in which the inventor claims a Garment in which "the substrate is formed of a woven nylon screen or mesh material" and "the exterior layer comprises a nylon fabric which has a camouflage pattern printed thereon."  (Doc. 1-1 at 6:37-39, 46-48.)  Plaintiffs argue that when you read Claims 11, 12, and 15 together, it is clear that Crye intended to claim a Garment in which both layers are made from the same base polymer (nylon).

This, Plaintiffs assert, precludes Defendant's construction, which would prohibit two nylon layers.

Defendants also cite Claims 12 and 15, but argue that they are independent from one another and that neither speaks to both the substrate and the exterior layer, meaning that neither proves that both layers can be the same base polymer nor disproves that the layers must have different base polymers.  (Doc. 50 at 17-18.)  In addition, they assert that the description of the preferred embodiment identifies the "materials" used for either layer by their base polymers without mentioning their relevant properties.  (Doc. 1-1 at 2:64-3:10.)  Finally, Defendant argues that Plaintiffs' proposed construction would leave future inventors unable to determine which properties are relevant to Claim 11's coverage.  For instance, Defendant asks whether two samples of the same nylon mesh fabric, dyed different colors, would have "different properties" even though they are functionally identical.

The Court believes that Defendant's proposed construction seems to misread the syntax of this disputed claim phrase.  Specifically, the Court notes that the claim phrase does not contemplate "different materials" but rather that the substrate is made from "a material different from" the material used for the exterior layer.  (Doc. 1-1 at 6:23-24.)  "Different" means "unlike in nature, form, or quality; not the same kind; dissimilar."  Oxford English Dictionary (2d ed. 1989).  Accordingly, the fifth disputed claim phrase allows the use of materials made from the same base polymer so long as they are "unlike in nature, form, or quality" in some way.

More directly, the Court is not persuaded by Defendant's argument that the layers should be limited based on their base polymers.  Of note, while the specification's only reference to the materials used in producing the substrate and exterior layer identifies those materials by their base polymers, that list expressly includes a material made from nylon as examples for both

20

layers.  The Court therefore concludes that Defendant's base-polymer construction is contrary to the text of the specification.

However, the Court does not believe that any difference should suffice, whether or not the difference has a functional effect on the material.  Accordingly, the Court will reject both proposed constructions and will construe the fifth claim phrase as:

> **the substrate being a material with different functional properties from the material of the exterior layer.**

The Court believes this construction preserves Crye's intent (as asserted by Plaintiffs) to differentiate the materials based on their functions while also limiting the claim phrase in a way that minimizes the risk of confusion to future inventors.  *See Furminator, Inc. v. Munchkin, Inc.*, No. 4:08CV00367 ERW, 2009 WL 3805564, at *8 (E.D. Mo. Nov. 9, 2009).

### Phrase 6. *"the strap extending around one of the first and the second horizontal bands"*

The Court first notes that both parties' positions on the construction of this claim phrase changed between briefing and the *Markman* hearing.  Defendant originally proposed a construction that contemplated "the strap completely encircl[ing]" one band on the Garment. (Doc. 50 at 19-20.)  But after reading Plaintiffs' claim construction brief and recognizing that its proposed construction would not encompass the Attachment, Defendant proffered a new construction:  "the strap spanning one of the first or second horizontal bands and reengaging the accessory by some securing means."  (Doc. 57 at 21.)

Meanwhile, Plaintiffs have always argued that the claim phrase requires no construction because it was readily understandable as-is, but their interpretation of the phrase's plain and ordinary meaning seems to have changed.  In their claim construction brief, Plaintiffs asserted that "extending around one of the first and the second horizontal bands" means "that the strap extends around *either* the first *or* the second horizontal band."  (Doc. 52 at 18 (emphasis added).)

At oral argument, however, Plaintiffs argued that case law construes "one of the first and the second" to mean "one or both" such that the '436 Patent covers MOLLE accessories that attach to the Garment by means of "weaving" a strap behind and in front of multiple bands.  In the interest of fairness, the Court will consider the parties' more recent positions, as argued during the hearing.

Construing this disputed claim phrase presents two independent questions:  (1) Does "extending around" require capturing the band in a closed loop created by the Accessory's component parts (as Defendant argues) or merely interfacing with both sides of the band (as Plaintiffs argue)?; and (2) Does "one of the first and the second" mean *the first, the second, or both* (as Plaintiffs argue) or *the first or the second, but not both* (as Defendant argues)?

### a.  <u>"extending around"</u>

Defendant argues that, to extend around the band, the accessory's strap must reattach to the accessory, creating a closed loop; "it cannot merely come in contact with a small part of the band."  (Doc. 57 at 21.)  Defendant's argument relies heavily on Claim 11's description of the back of the Accessory:  a rear wall and a strap fastened to the rear wall.  (Doc. 1-1 at 6:33-34.) Defendant points to the preferred embodiment to show the described encirclement.  (*See* Doc. 1-1 at Fig. 3 (showing that the Accessory's strap reattaches to the rear wall by means of a fastener), Fig 4 (illustrating that the Accessory mounts by way of wrapping around one band).)

Plaintiffs argue that "extending around" is not so limited as to require a closed loop. They argued at the hearing that Claim 11 would cover, for instance, a MOLLE accessory that attaches to horizontal bands by means of a clip that engages both sides of a band or, as mentioned, a strap that weaves on either side of multiple bands.  In other words, Plaintiffs assert that there need not be a closed loop around any given band.

The Court concludes that the plain and ordinary meaning of "extend around" does not require a closed loop as contemplated by Defendant's proposed construction. The primary factor is how to define "around." When the described scenario involves a circle or other closed shape, to extend *around* means "[a]long the circuit or surface . . . so as to encircle, enclose, or surround something." Oxford English Dictionary (2d ed. 1989). However, when there is no closed shape, "around" can mean to be "on every side," *id.*, without returning to meet its origin point, such as extending around a corner.

The Court agrees that, in this case, the more customary meaning of "around" is "on every side" rather than "to surround." The Court believes that a clip that slides snugly over the top of a band to secure the Accessory to the Garment "extends around" the band without creating a full circle or reengaging the Accessory. The Court therefore concludes that "extend around" does not require that the strap complete a full circle around the band and reengage the Accessory.

### b.  <u>"one of the first and the second"</u>

The second part of this claim phrase is more difficult to construe. The Court begins by noting that "one of the first and the second horizontal bands" is syntactically inconsistent. "One of" very plainly means a single item from a list while the use of "and" between two list items plainly means both—the first *and* the second. It cannot be true that something refers to a single item on a list and also to both items on the list.

At the *Markman* hearing, however, Plaintiffs cited *NFC Tech., LLC v. Samsung Elecs. Co.*, No. 2:15-CV-00283-JRG-RSP, 2016 WL 1704770, at *15 (E.D. Tex. Apr. 28, 2016), for the proposition that the use of "and" merely delineates the two list items, "defin[ing] the set from which 'one of' must be selected." In this way, Plaintiffs imagine "and" to serve the same function as the word "or," separating the possible bands around which the strap might extend:

the first or the second.  Going further, Plaintiffs argue that "'one of' does not mean 'only one of,'" meaning that while the strap must extend around *at least* one of the first two bands, it could also extend around *both* the first and the second bands.

The Court cannot square Plaintiffs' proposed construction with the plain meaning of the claim phrase text.  It can accept that, in this instance, "and" means "or," but it cannot accept that "one of" means "one or both of."  Nor does the Court believe that a person of ordinary skill in the art would understand "one of the first and the second" to mean "the first or the second or both the first and the second."  Plaintiffs proffer expert testimony that "there's no upper-bound limit on the number of bands that's specified in the claim."  (Doc. 58 at 21.)  While it may be true that "one of" does not expressly cap the number of bands involved, the Court rejects Plaintiffs' argument that the plain meaning of "one of" implicitly includes both bands.  The Court therefore finds that the plain meaning of "one of" is "only one of."  Absent substantial supporting evidence, not present here, the Court will not construe a word to mean something other than its plain and ordinary meaning.

The Court additionally notes that the preferred embodiment depicts the Attachment connected by means of the strap extending around a single band.  (Doc. 1-1 at Fig. 4.)  The Court has previously noted that the preferred embodiment is not strong evidence to support a specialized construction.  However, in this case, the depicted embodiment aligns with the plain and ordinary meaning of the text—a good indication that the text should be given that meaning. The Court therefore construes "one of the first and the second horizontal bands" as "only the first or only the second horizontal band," in line with Defendant's proposed construction.  That said, because the Court rejected Defendants' proposed construction of "extending around," it must marry parts from both parties' proposed constructions and construe disputed claim phrase six as:

**the strap extending around only the first or only the second horizontal band.**

24

The Court believes this construction appropriately interprets the broad range of means by which an Accessory can be strapped to the garment without construing the claim phrase in a manner contrary to its plain meaning.

<strong>Conclusion</strong>

For the foregoing reasons, the Court construes the six disputed claim phrases from Claim 11 as follows:

1. **"elements arranged to engage a wearer;"**

2. **"a plurality of laser cut openings;"**

3. **"a first horizontal band above a second horizontal band;"**

4. **"the first horizontal band being spaced from the second horizontal band;"**

5. **"the substrate being a material with different functional properties from the material of the exterior layer"; and**

6. **"the strap extending around one of the first or the second horizontal bands."**

The Court concludes that these constructions represent the plain and ordinary meaning of the claim phrases, as evidenced by the record evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the Court's stay of August 26, 2019, is **LIFTED**.

**IT IS FURTHER ORDERED** that the disputed claim phrases from Claim 11 shall be construed as set forth in this Order.

**IT IS FINALLY ORDERED** that, pursuant to the Court's October 23, 2018, scheduling plan (Doc. 30), the parties **SHALL**, <u>**within fourteen (14) days of the date of this order**</u>, conduct a supplemental Rule 26(f) conference and **SUBMIT** a supplemental proposed schedule to the Court that addresses the following:

(A) The date by which the parties shall complete all fact discovery;

25

(B) Disclosure of expert witnesses and expert reports, other than experts

designated for claim construction purposes, and depositions of expert witnesses;

(C) Dates for filing any motions to dismiss, motions for summary judgment or, if applicable, any motion to exclude testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or *Kuhmo Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999);

(D) The expected date by which this case should be ready for trial and the parties' estimation on its length; and

(E) Any other matters counsel deem appropriate for inclusion in the supplemental schedule.


Dated this 31st day of May, 2020.


_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE